AO106(Rev.5/85) Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

In the Matter of the Search of
(Name, address or brief description of person, property, or premises to be searched)

HP Laptop Computer in Kenneth Cole Reaction Laptop Bag
Serial # CNF4370JK2
Property Tag # 220990

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

CASE NUMBER:

(Further described below)

I    Ronald D. Williams    being duly sworn depose and say:

I am a(n)    Special Agent with Internal Revenue Service - Criminal Investigation    and have reason to believe
              (Official Title)
that ☐ on the person of or ☒ on the property or premises known as   (name, description and or location)

See Attachment A

in the District of Columbia, there is now concealed a certain person or property, namely (describe the person or property to be searched)

See Attachment B

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

fruits, evidence, and instrumentalities,

concerning a violation of Title  18  United States Code, Section(s) § 1343 and § 1956 . The facts to support a finding of Probable Cause are as follows:

SEE ATTACHED AFFIDAVIT HEREIN INCORPORATED BY REFERENCE AS IF FULLY RESTATED HEREIN

Continued on the attached sheet and made a part hereof.    ☒ YES    ☐ NO

Virginia Cheatham
Fraud and Public Corruption Section
(202) 514-9732

Signature of Affiant
Ronald D. Williams
Internal Revenue Service - Criminal Investigation

Sworn to before me, and subscribed in my presence

at Washington, D.C.

_____
Date

_____                                    _____
Name and Title of Judicial Officer                          Signature of Judicial Officer

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF:

HP Laptop Computer in Kenneth Cole Reaction Laptop Bag
Serial # CNF4370JK2
Property Tag # 220990

Located at:

Internal Revenue Service - Criminal Investigation
500 North Capitol Street N.W.
Washington, D.C. 20221

### AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Ronald D. Williams, being first duly sworn, depose and state as follows:

**Introduction**

1. I am a Special Agent with the United States Internal Revenue Service, Criminal Investigation Section ("IRS-CI"), and I have been employed by the IRS-CI since February 22, 2003. As an IRS Special Agent, I am responsible for investigating possible violations of federal tax and criminal law, including violations of Titles 18, 26 and 31 of the U.S. Code. I have conducted numerous prior and ongoing investigations into violations of such federal crimes as the Money Laundering Control Act (Title 18), the internal revenue laws (Title 26), the Bank Secrecy Act (Title 31) and similar financial and non-financial offenses. I have participated in complex interstate criminal investigations with agents and detectives from the Federal Bureau of Investigation, the Department of Homeland Security, the Virginia State Police, the Arlington County Police and the Northern Virginia High Intensity Drug Trafficking Area (HIDTA) Task Force. I have received more than twenty (20) hours of training in federal search and seizure procedures and have participated in the preparation and execution of numerous search warrants.

2. The information contained in this Affidavit is based on my personal knowledge, the review of documents, and observations made by me during the course of this investigation, as well as, information conveyed to me by other individuals, including information obtained from a Special Agent with the Federal Bureau of Investigation, an investigator with the Enforcement & Investigation Bureau of the District of Columbia's Department of Insurance, Securities & Banking, the Arlington County Police Department, and the Virginia State Police.

3. Because this Affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, this Affidavit does not set forth each and every fact learned by me or observed by me during the course of this investigation.

4. This Affidavit is made in support of an investigation concerning federal offenses, including, but not limited to, violations of Title 18 of the United States Code, including wire fraud in violation of 18 U.S.C. § 1343 and money laundering in violation of 18 U.S.C. § 1956.

5. Based on the investigation detailed in this Affidavit, I believe probable cause exists to conclude that the items described in Attachment A, which is incorporated herein by reference, and located at The Internal Revenue Service – Criminal Investigation Office 500 North Capitol Street Suite 3605 Washington, DC 20221 contain evidence, contraband, instrumentalities of crimes, or fruits of crime in the form of electronic data, that are evidence of violations of federal law, including wire fraud in violation of 18 U.S.C. § 1343 and money laundering in violation of 18 U.S.C. § 1956.

**Summary of Probable Cause**

6. On June 10, 2005, an Arlington County Police officer approached a car driven by Duane McKinney, a Maryland resident, ("Mr. MCKINNEY") stopped near the intersection of Route 50 and Washington Boulevard in Arlington County, VA. The car, a 2002 Black 745LI 4-

2

Door BMW, was pulled over along the shoulder of the road. When the officer asked the driver for his identification, Mr. MCKINNEY produced a Maryland driver's license indicating that he resided at 266 Harry S. Truman Drive, Upper Marlboro, Maryland.

7. During the officer's encounter with Mr. MCKINNEY, the officer checked for any outstanding warrants in Mr. MCKINNEY's name. The officer learned that Mr. MCKINNEY had a valid outstanding Failure to Appear warrant for a criminal case involving an assault and battery charge in Arlington County, VA. The officer arrested Mr. MCKINNEY on the outstanding warrant and advised Mr. MCKINNEY of his rights.

8. After Mr. MCKINNEY was arrested, there was no adult with a valid drivers' license with Mr. MCKINNEY to remove the BMW from its location along the road in Arlington, Virginia. Therefore, in order to move the vehicle from its location, the Arlington County Police Department took custody of the car. Thereafter, officers conducted an inventory search of the vehicle.

9. During the inventory search of the vehicle, officers discovered in the truck of the vehicle a HP laptop computer, serial number CNF4370JK2 and a duffle bag containing $159,040 in cash. After the currency was discovered, Mr. MCKINNEY engaged in a discussion with Arlington County Police officers. During that discussion, officers asked Mr. MCKINNEY about the origin of the $159,040.00 found in the trunk of the BMW. Mr. MCKINNEY stated that he was a real estate investor. He indicated that he was President and founder of a non-profit organization called "The Brotherhood of Men, Incorporated," located in Washington, D.C., which has been in existence for about ten years. Mr. MCKINNEY stated that he had withdrawn the $159,040.00 from the Bank of America in Washington, D.C., in incremental stages during the year.

3

10. Mr. MCKINNEY stated that one of the purposes of the "Brotherhood of Men, Inc." is to "quitclaim" property and to buy properties. Mr. MCKINNEY explained that he had cash in his BMW automobile to pay individuals who wanted to sell their real property to him. McKinney stated that the Brotherhood of Men, Inc.'s mission is to assist disadvantaged youth with job training and fatherhood initiatives. He further stated that one of the ways in which the Brotherhood of Men, Inc. obtained funding was to obtain quitclaim deeds on real properties that the organization would fix up and sell at a profit.

11. Following the arrest of Mr. MCKINNEY, the Arlington County Police Department retained the BMW, $159,040.00 in cash found in the duffle bag in the car, and the HP laptop computer found in the BMW.

12. After Mr. MCKINNEY's arrest, I conducted an investigation with members of the HIDTA Northern Virginia Money Laundering task force to trace the origins of the $159,040.00 in cash.

13. During the investigation, I learned that Mr. MCKINNEY is or was involved in a number of lawsuits in D.C. Superior Court involving contests over the true ownership of real property. I and other investigators obtained a list of properties at issue in these court cases, and we interviewed witnesses and otherwise investigate the transfer and ownership of these properties.

14. During the investigation, I researched deeds at the District of Columbia's Recorder of Deeds Office. A search in that office for properties that were either deeded to Mr. MCKINNEY or the Brotherhood of Men, Inc., produced a list of several properties, among them: (1) 4265 Edson Place, N.E. Washington, D.C., deeded from Carson Ruffner ("Edson Place property"); (2) 5021 Hanna Place, N.E. Washington, D.C., deeded from John Albert and

4

Leona Marsh Harrington ("Hanna Place property"); and (3) 1927 3rd Street, N.E. Washington, D.C., deeded from Ronald Washington ("3rd Street property"). Some details of my investigation into these properties are detailed below:

Edson Place Transactions

15.     I conducted an investigation into the ownership and any sales of the real property in the District of Columbia located at 4265 Edson Place, N.E., Washington, D.C. The investigation revealed that on July 21, 2004, a deed was filed in the D.C. Recorder of Deeds office indicating that an individual named Carson Ruffner had transferred ownership of the Edson Place property to the Brotherhood of Men, Inc. However, law enforcement agents interviewed Mr. Ruffner in Falls Church, Virginia concerning the true ownership of the Edson Place property. Mr. Ruffner was shown a copy of the July 22, 2004 deed in which he purportedly conveyed the Edson Place property to the Brotherhood of Men, Inc. The deed purportedly contained Mr. Ruffner's signature. However, Mr. Ruffner indicated that the July 24, 2004 deed was a forgery, that he had not signed the deed, and that he had never before seen the deed.

16.     Further investigation revealed that, on August 12, 2004, the Brotherhood of Men, Inc., had conveyed its interest in the Edson Place property to Qiyao Yuan (Yuan) and Vivian Kwok (Kwok), through a deed signed by Mr. MCKINNEY.

17.     Yuan told me that he and Kwok paid MCKINNEY $50,000 using a Bank of America cashiers' check for the property at 4265 Edson Place N.E. Yuan told me and another agent that he borrowed the money from Kwok and she had borrowed it on his behalf to pay MCKINNEY for the property.

5

18.     According to a Bank of America account statement recovered from Mr. MCKINNEY's BMW during the inventory search, on August 13, 2004 a $40,000 deposit was made into Bank of America account held in the name of the Brotherhood of Men, Inc. The only deposit made during that statement period was $40,000.

19.     The true owner of the Edson Place property, Mr. Ruffner, indicated to the law enforcement agents that he had never heard of the Brotherhood of Men, Inc. Mr. Ruffner stated that he was aware of a Duane McKinney, but had no knowledge of him. Mr. Ruffner stated that he had no knowledge of Kwok or Yuan (also known as "Charlie"). Mr. Ruffner did say that he knew a "Charlie," but he indicated that he did know whether the "Charlie" he knows was the same person also known as Qiyao Yuan.

<u>Hanna Place Transactions</u>

20.     I also conducted an investigation into the ownership of the Hanna Place property. This investigation revealed that on February 16, 2005, a deed was recorded at the District of Columbia's Recorder of Deeds office conveying the Hanna Place property from John A. and Leona M. Harrington to The Brotherhood of Men, Inc. A review of the recorded deed shows that it was returned to "DUANE MCKINNEY, 266 HARRY S TRUMAN DR., LARGO, MD 20774."

21.     Further investigation by me and other law enforcement agents – including a review of Social Security records and an interview of a Hanna Place property neighbor – revealed that the alleged conveyors of the Hanna Place property were dead on the date they allegedly signed the deed (February 10, 2005) conveying ownership of the property to the Brotherhood of Men, Inc.

22. Further investigation revealed that on April 23, 2005, The Brotherhood of Men, Inc., conveyed the Hanna Place property to an individual named Chen Ping. The deed purportedly was signed by Mr. MCKINNEY on April 23, 2005.

23. Bank of America records show that on April 25, 2005 – just two days after the sale of the Hanna Place property, a deposit of $20,000 in the form of a cashier's check was made into the Brotherhood of Men, Inc., account and endorsed by Mr. MCKINNEY. Ping Chen, who was deeded the Hanna Place property from the Brotherhood of Men, Inc., on April 23, 2005, was the remitter on the cashier's check.

### 3rd Street Transactions

24. I and other agents conducted an investigation of the true ownership of the 3rd Street property. Through our investigation, we discovered that on July 6, 2004, a deed was filed with the District of Columbia's Recorder of Deeds office allegedly conveying ownership of the 3rd Street property from an individual named Ronald Washington to the Brotherhood of Men, Inc. The deed was witnessed with what appears to be Mr. MCKINNEY's signature. Records reveal that Ronald Washington died February 11, 1997.

25. I discovered that among the items found in Mr. MCKINNEY's BMW at the time of his arrest on June 16, 2005 were: (1) a photograph of the 3rd Street property; (2) notices and bills concerning the 3rd Street property addressed to Ronald Washington, the true owner of the property, including notices from various District of Columbia agencies regarding delinquent water/sewer charges, property tax bills, and other expenses pertaining to the 3rd Street property; and (3) receipts from cashier's checks from the Bank of America used to pay the District of Columbia's real property tax bills for the 3rd Street property.

26. Further investigation revealed that Ronald Washington was deceased on July 6, 2004, when, according to the deed filed with the District of Columbia's Recorder of Deeds on July 6, 2004, Ronald Washington signed a deed conveying the 3rd Street property to the Brotherhood of Men, Inc. A review of Social Security records and a death certificate reveal information indicated that Ronald Washington died on February 11, 1997.

27. During our investigation into the 3rd Street property transaction, I and other agents discovered that on June 16, 2005, Cosmopolitan Real Estate Settlement, Inc., of Silver Spring, Maryland, caused $295,328.38 to be wired from its account at the Columbia Bank, located in Maryland, to the Bank of America account number 001922787468 in the District of Columbia, which is the Brotherhood of Men's account for which Mr. MCKINNEY is the sole approved signatory. On June 20, 2005, Mr. MCKINNEY withdrew $290,000 from the same account via a single cashier's check payable to him.

28. On July 8, 2005, Ralph Bernardo, President of Cosmopolitan Real Estate Settlement Group, said that the $295,328.38 wire to the Brotherhood of Men, Inc., bank account was part of a real estate settlement. Mr. Bernardo produced a settlement sheet indicating that the money was transferred to the Brotherhood of Men, Inc., account as part of the settlement of the sale of the 3rd Street property.

29. The settlement sheet produced by Mr. Bernardo for the 3rd Street property listed the seller as The Brotherhood of Men, Inc., and the purchaser as an entity named 1612 7th, N.W. LP.

30. I submit that the evidence obtained during this investigation shows probable cause to believe that there was a scheme to transfer properties to the Brotherhood of Men using forged deeds (in a scheme to defraud the true owners) involving Duane MCKINNEY and that

8

the proceeds of the subsequent sale of those properties – including the $295,328.38 wired to the Bank of America account were the proceeds of fraud. Forged deeds, as well as other written documents such as copies of bank cashiers checks with descendants names in the remitter section appears to be indicative of a false pretense and representations that are a necessary component of the scheme.

31. Based upon my knowledge, training, and experience, I know that:

    a. Individuals involved in wire fraud and money laundering will record their financial activities, including their expenditures of money and wealth, within their computers, and oftentimes require the use of a computer system to create official looking letters, documents, financial records, and invoices, which are stored on their computers. I know that evidence of this activity can be recovered from computers and computer related storage devices;

    b. Individuals involved in these fraudulent activities generally document their activities and associations with other coconspirators by keeping telephone ledgers, logs and notes. This information can also be kept on computer systems and related floppy disks which are sometimes encrypted or password protected;

    c. Individuals involved in fraudulent activities use personal computers to correspond with other individuals involved in the fraudulent activity through electronic mail or the Internet and this information can also be kept on computer systems and related floppy disks which are sometimes encrypted or password protected;

32. Based on my training, experience in the area of financial crimes investigations, and my discussions with other law enforcement officers, including agents from the United States Internal Revenue Service, I know that:

9

      a.    computer hardware, software, and electronic files may be important to a criminal investigation in two distinct ways: (1) the objects themselves may be contraband, evidence, instrumentalities, or fruits of crime, and/or (2) the objects may be used as storage devices that contain contraband, evidence, instrumentalities, or fruits of crime in the form of electronic data. Rule 41 of the Federal Rules of Procedure permits the government to search for and seize computer hardware, software, and electronic files that are evidence of crime, contraband, instrumentalities of crime and/or the fruits of crime. In this case, I believe that the computer hardware is a container for evidence and a container for contraband;

      b.    a complete and thorough examination of a computer system and its stored data, either hidden, encrypted or password protected, is a time consuming process that takes days, weeks and sometimes months; and

      c.    a complete and thorough exam of any computerized evidence could not be completed at the location the computers were obtained, and that it would be necessary to search all computer equipment, to include external hard drives, floppy disks and related equipment and accessories, at a controlled site.

      d.    searching information from computers often requires agents to seize most or all electronic storage devices (along with related peripherals) to be searched later by a qualified computer expert in a laboratory or other controlled environment;

      e.    computer storage devices (like hard disks, diskettes, tapes, laser disks, Bernoulli drives) can store the equivalent of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process

10

can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on site;

   f. searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, however, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

   g. the analysis of electronically stored data, whether performed on-site or in a separate, controlled environment, may entail any or all of several different techniques. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "key-word" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exists that are related to the subject matter of the investigation;

11

   h. searching computerized information for evidence or instrumentalities of crime commonly requires agents to seize most or all of a computer system's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. This is true because the peripheral devices which allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output (or "I/O") devices in order to read the data on the system. It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence listed above. In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices.

   i. a complete and thorough forensic examination of a computer or computer system and its stored data, either hidden, encrypted, or password protected, is a time-consuming process that takes weeks and sometimes months to complete; it may be necessary for programmers and other outside experts to assist the Internal Revenue Service and the Federal Bureau of Investigation during the examination of the computer evidence.

## CONCLUSIONS OF AFFIANT

33. Based on the investigation I have conducted along with the Arlington County Police, the Virginia State Police, the Federal Bureau of Investigation, the D.C. Department of Insurance, Securities and Banking, and the members of the HIDTA Northern Virginia Task Force, my training and experience in these investigations, and the facts articulated in this

12

affidavit, I submit that there is probable cause to believe that proceeds from a fraudulent sale of the 3rd Street property were wired into the Bank of America, account number 001922787468, and that an interstate use of the wires to further a fraudulent scheme was executed in violation of the federal wire fraud statute, 18 U.S.C. § 1343. I likewise submit that there is probable cause that Duane MCKINNEY, by using such criminal proceeds in such manner, and by removing funds from that same bank account, violated the federal money laundering statute, 18 U.S.C. § 1956.

38.  Based on the summary of the investigation recited above, there is reason to believe that the laptop computer listed in Attachment A may also contain evidence of financial records, business records, e-mails, deeds, and other records relating to Mr. MCKINNEY's criminal activity and will be stored on Mr. McKINNEY's computer. Based upon the facts and circumstances set forth above, I respectfully request that a search warrant be issued allowing agents of the United States Internal Revenue Service – Criminal Investigation component and other law enforcement officers, to search the items described more particularly in Attachment A to this Affidavit.

```
                                              _____
                                              Ronald D. Williams
                                              Special Agent, IRS-CI
```

Subscribed and sworn to before me

this                       day of                              ,        .

```
              _____
              UNITED STATES MAGISTRATE
                        JUDGE
```

13

## ATTACHMENT A

### DESCRIPTION OF THE PREMISES TO BE SEARCHED

HP Laptop Computer
in Kenneth Cole Reaction Bag
Property Tag # 220990
Serial # CNF4370JK2

Located at:

Internal Revenue Service - Criminal Investigation
500 North Capitol Street N.W.
Washington, D.C. 20221

## ATTACHMENT B

**DESCRIPTION OF THE ITEMS TO BE SEIZED**
IN THE MATTER OF THE SEARCH OF
HP Laptop Computer
in Kenneth Cole Reaction Bag
Property Tag # 220990
Serial # CNF4370JK2

1. Records, documents, and materials containing information of criminal activity related to any scheme to defraud another of property or money laundering, as outlined in the attached Affidavit in support of the search warrant. The terms "records," "documents," and "materials" include records in all forms.

2. Any notes, day planner, calendars, chronologies, and summaries of daily activities.

3. Any spreadsheets, data bases, charts and tables related to daily activities or property owned.

4. Any telephone ledgers, logs, notes.

5. Any deeds, completed or in blank.

6. Any notary seals, stamps, or documents relating to notary publics.

7. Any bank or financial institution documents, including account statements, deposit slips, canceled checks and related records, investment account statements, money order and cashier's checks and receipts, any spreadsheet in any data base or software program showing any financial accounting of money or deposits. Any correspondence with any bank or financial institution. Any applications for loans or lines of credit and any documents relating to any applications for loans or lines of credit.

8. Any financial records, invoices, tax returns.

9. Any documents relating to The Brotherhood of Men, or any other business or charity.

10. Any correspondence, including cover pages of facsimile transmissions, relating to real estate property, including any court filings and correspondence with the Recorder of Deeds office, any courts, electric company, water company, purported homeowners, attorneys, any entity purchasing tax liens, and any department or agency of the District of Columbia or Prince George's County, Maryland.

11. Any and all fruits, instrumentalities, and evidence of the crimes of 18 USC § 1343 (Wire Fraud) and 18 U.S.C. § 1956 (Money Laundering).